UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- against -

BRUCE SILVA,

Defendant.

**MEMORANDUM
OPINION & ORDER**

23 Cr. 204 (PGG)
22 Cr. 347 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this racketeering case, Defendant Bruce Silva moves to suppress evidence

obtained from a cellphone seized from his person at the time of his arrest.  (23 Cr. 204, Dkt. No.

109)  Silva argues that the search warrant for his cellphone was not supported by probable cause.

(23 Cr. 204, Def. Br. (Dkt. No. 110) at 2)[1]

For the reasons stated below, Silva's motion to suppress will be granted.

**BACKGROUND**

**I.      THE CRIMINAL COMPLAINT AND INDICTMENT**

On October 14, 2021, Magistrate Judge Sarah Netburn signed a sealed Complaint

charging Silva with felon in possession in connection with an August 13, 2019 shooting in the

Bronx.  (22 Cr. 347, Cmplt. (Dtk. No. 1))

Silva was arrested on March 23, 2022.  At the time of his arrest, Silva had in his

possession a blue Apple iPhone, which was seized by law enforcement agents.  (23 Cr. 204, Mar.

---

[1]  The page numbers of documents referenced in this opinion correspond to the page numbers
designated by this District's Electronic Case Files ("ECF") system.

23, 2022 Arrest Report, Ex. A (Dkt. No. 110-1) at 2-3)  Silva does not dispute that he possessed the phone at the time of his arrest.  (23 Cr. 204, Def. Br. (Dkt. No. 110) at 2)

On June 21, 2022, the Government obtained an indictment charging Silva with felon in possession.  (22 Cr. 347, Indictment (Dkt. No. 10))

On April 18, 2023, the Government obtained a racketeering indictment in a separate case charging Silva and nine co-defendants.  (23 Cr. 204, Indictment (Dkt. No. 1))  The second indictment charges Silva with (1) racketeering conspiracy (id. ¶ 6); (2) three counts of attempted murder and assault with a dangerous weapon (id. ¶¶ 10, 13, 16); (3) three counts of using, carrying and discharging a firearm during and in furtherance of a crime of violence (id. ¶¶ 11, 14, 17); (4) conspiracy to distribute fentanyl, heroin, oxycodone, cocaine base, and marijuana (id. ¶¶ 34-36); and (5) using and carrying a firearm during and in furtherance of a drug trafficking crime.  (Id. ¶ 37)

In a May 18, 2023 order, this Court consolidated Silva's felon in possession case with the racketeering case.  (23 Cr. 204, Dkt. No. 50)

## II.    THE SEARCH WARRANT AFFIDAVIT

On April 6, 2022 – two weeks after Silva's arrest on the felon in possession charge but nearly a year before the racketeering indictment – Magistrate Judge Jennifer Willis signed a search warrant authorizing the Government to search the contents of the cellphone seized from Silva at the time of his arrest.  (23 Cr. 204, Apr. 6, 2022 Search Warrant, Ex. B (Dkt. No. 110-1))

Detective Joseph Boyer of the New York City Police Department (the "NYPD") submitted an eight-page affidavit in support of the warrant application (the "Boyer Affidavit"). In his affidavit, Det. Boyer asserts that there is probable cause to believe that Silva's cellphone

2

contains evidence of, <u>inter alia</u>, wire fraud, felon in possession, racketeering, acts of violence in aid of racketeering, and other firearms offenses. (<u>Id.</u> at 14)

Det. Boyer states that – based on "conversations with a confidential informant" – he has learned that

> SILVA is a member of a violent gang known as "Dub City," which operates in the vicinity of East 175 Street to East Burnside Avenue in the Bronx, New York. SILVA has been a member since at least the late 2000s. SILVA engages in a variety of financial scams to make money for the gang including using credit cards linked to fake identities.
>
> In or about October 2021, SILVA approached a member of Dub City, known as "BG," and stated, in sum and substance, that SILVA was taking control of the territory. BG refused and SILVA physically attacked him. BG ran, pulled a gun, and shot at SILVA.
>
> Thereafter, in or about November 2021, SILVA and another individual ("CC-1") approached a member of Dub City known as "Suave." Suave had taken possession of a gun that belonged to SILVA and CC-1. Suave refused to return the gun, and the group engaged in a physical altercation. The group then got into a shootout later the same evening.

(<u>Id.</u> at 14-15) (emphasis in original)

The Boyer Affidavit also incorporates by reference the October 14, 2021 Criminal Complaint that charges Silva with felon in possession. (<u>Id.</u> at 15) As summarized in the Boyer Affidavit, the Complaint alleges that,

> on or about August 13, 2019, SILVA approached a parked vehicle and shot at the occupant multiple times. One of the bullets struck the occupant in the back and paralyzed him/her. SILVA is captured on surveillance video and the victim positively identified SILVA as the shooter out of a photo array.

(<u>Id.</u>) (citations omitted and emphasis in original) Detective Boyer goes on to state that, based on his "personal participation in this matter," he knows that "the location of the shooting – 105 East 175th Street in the Bronx, New York – is in Dub City's territory." (<u>Id.</u>)

Det. Boyer further alleges that Silva was a fugitive for about four months before his March 23, 2022 arrest on the felon in possession charge:

> [I]n or about November 2019, a grand jury in the Bronx issued an indictment charging BRUCE SILVA with, among other things, attempted murder in violation [of] NYPL Section 125.25(1) for a shooting he committed in August 2019. . . .
>
> SILVA was scheduled to appear in Bronx Criminal Court in connection with his state charges on or about December 1, 2021. The Government intended to arrest SILVA on his federal charge at the same time.  SILVA, however, failed to appear and remained a fugitive on the state and federal charges for approximately four months until March 2022.
>
> Based on my conversations with members of the United States Marshals Service ("USMS"), I know that USMS arrested SILVA on or about March 24, 2022. SILVA had the [blue iPhone] on his person at the time of his arrest.  He had a fake driver's license in the name of "Carlos Silva" and [a] debit card listed to the fake identity.

(Id. at 15-16)

Detective Boyer further states that he has "participated in numerous gang and homicide investigations that have involved . . . executing search warrants, including warrants involving electronic evidence . . . and the retrieval and analysis of cellphone and social media data." (Id. at 12)  As a result of his "training, education, and experience," Det. Boyer has "become familiar with the manner in which violent crimes are planned and executed and the way gangs operate and ha[s] become familiar with the manner in which gang members and individuals engaged in violent crime use cellphones in connection with such activity."  (Id.)

"[B]ased on [his] experience and training in investigating gangs, fugitives, and violence offenses," Det. Boyer knows that

> [i]ndividuals engaged in gang-related violence and other organized criminal activity need to arrange and coordinate their illicit activities and often use cellular telephones to do so.  Accordingly, a search of the data on a cellular telephone often reveals communications with, and identifying information for, fellow gang members and co-conspirators, including voicemails, messages or "chats" (including SMS, Facebook/Instagram messages, messages sent or received using other applications), telephone numbers, email addresses, and identifiers for messaging and social media accounts. . . .
>
> Individuals engaged in gang-related violence and other organized criminal activity often have photographs and video of themselves, their criminal associates,

4

their property, and the tools and proceeds of their criminal activities (such as firearms and cash proceeds) stored [on] their cellular telephones.

Furthermore, fugitives frequently use cellular devices to coordinate their flight and evade law enforcement.  This includes, among other things, arranging for others to provide them housing, transportation, and money.

(Id. at 16-17)

Based on these allegations, Det. Boyer asserts that "there is probable cause to believe that the [blue iPhone seized from Silva] contains evidence of SILVA's participation [in] Dub City, his flight from justice from in or about December 2021 to March 2022, and by extension his consciousness of guilt for the August 2019 shooting." (Id. at 17)

## DISCUSSION

As noted above, Silva does not dispute that he possessed the iPhone in question when he was arrested on March 23, 2022.  (23 Cr. 204, Def. Br. (Dkt. No. 110) at 2)  Silva also concedes that

[t]he Boyer Affidavit contains specific factual information . . . that establishes probable cause to believe that (1) Mr. Silva is a member of the "Dub City" gang; (2) engaged in violent acts with other members of Dub City in October and November of 2021, (3) engaged in a shooting in [August] 2019, and (4) failed to appear for a court appearance in New York State court in December 2021 and was thereafter a "fugitive" until his arrest in March of 2022.

(23 Cr. 204, Def. Reply Br. (Dkt. No. 143) at 2)[2]

Silva argues, however, that Det. Boyer's affidavit does not provide "probable cause to believe that the blue iPhone contained evidence of a crime." (23 Cr. 204, Def. Br. (Dkt. No. 110) at 4)  According to Silva, the Boyer Affidavit contains no "specific information to

---

[2]  Silva contends that the Boyer Affidavit's one sentence allegation related to financial fraud – that "SILVA engages in a variety of financial scams to make money for the gang including using credit cards linked to fake identities" (23 Cr. 204, Apr. 6, 2022 Search Warrant, Ex. B (Dkt. No. 110-1) at 15) – does not provide probable cause to believe that Silva was engaged in wire fraud. (23 Cr. 204, Def. Reply Br. (Dkt. No. 143) at 2 n.1)

connect the iPhone to the alleged crimes," and "no specific facts [demonstrating] . . . that Mr. Silva used the blue iPhone in relation to or in furtherance of an alleged conspiracy." (Id. at 4, 7) Silva further contends that the Boyer Affidavit is "so lacking in indicia of probable cause that the Detective could not reasonably have relied on it" pursuant to the good faith exception to the exclusionary rule. (Id. at 11)

In opposing Silva's motion, the Government maintains that the Boyer Affidavit "established a fair probability that the iPhone contained evidence of Silva's crimes," because it "provided specific facts about Silva's gang-related criminal conduct." (23 Cr. 204, Govt. Opp. (Dkt. No. 140) at 3)

## I.    PROBABLE CAUSE

### A.    Applicable Law

Before "searching a cell phone seized incident to an arrest," law enforcement agents must "get a warrant." Riley v. California, 573 U.S. 373, 403 (2014).

The Second Circuit has summarized the probable cause inquiry as follows:

> [P]robable cause to search a location for . . . particular items or records is demonstrated where a totality of circumstances indicates a "fair probability that contraband or evidence of a crime will be found" thereby. Illinois v. Gates, 462 U.S. 213, 238 (1983). This standard does not demand "hard certainties," id. at 231, (internal quotation marks omitted), but it does require more than a "hunch," the latter being insufficient to support even an investigative stop, Terry v. Ohio, 392 U.S. 1, 22, 27 (1968). Rather, probable cause must be grounded in sufficient facts to establish the sort of "fair probability" on which "reasonable and prudent men, not legal technicians, act." Illinois v. Gates, 462 U.S. at 231, 238, 241 (internal quotation marks omitted); see Florida v. Harris, 568 U.S. 237, 244 (2013) (describing probable cause as a "practical," "common-sensical," "all-things-considered" standard for assessing probabilities in particular factual contexts).

United States v. Lauria, 70 F.4th 106, 128 (2d Cir. 2023) (citations omitted).

While "probable cause as to a person's criminal conduct can sometimes inform probable cause . . . to obtain records for electronic devices linked to that person" (id. at 130

n.14), the two inquiries remain distinct, because "the existence of probable cause to arrest will not necessarily establish probable cause to search." United States v. Gomez, 652 F. Supp. 461, 462 (E.D.N.Y. 1987) (quotations and citations omitted). An arrest warrant is properly issued where there is probable cause to believe that a suspect committed an offense. Steagald v. United States, 451 U.S. 204, 212-13 (1981). By contrast, a search warrant for a cellphone requires a factual showing demonstrating that there is "'a fair probability that . . . evidence of a crime will be found'" in the contents of the phone. Lauria, 70 F.4th at 128 (quoting Gates, 462 U.S. at 238). "This required nexus between the items sought and the 'particular place' to be searched protects against the issuance of general warrants." United States v. Clark, 638 F.3d 89, 94 (2d Cir. 2011) (citing Stanford v. State of Texas, 379 U.S. 476, 481 (1965)).

A magistrate judge's determination of probable cause to search is to "be paid great deference by reviewing courts." Spinelli v. United States, 393 U.S. 410, 419 (1969). Accordingly, a reviewing court's "task" "is simply to ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination." Clark, 638 F.3d at 93 (quoting Gates, 462 U.S. at 238). The deference owed to a magistrate judge's determination does not, of course, preclude a reviewing court from "properly conclud[ing] that . . . [a] warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances." United States v. Leon, 468 U.S. 897, 915 (1984) (citing Gates, 462 U.S. at 238-29).

The Second Circuit has urged lower courts to use "caution" in "assessing probable cause" in the context of search warrant applications for cell site location data, because such records "can reveal not only nearly the whole of an individual's movements but also, in the process, much about his personal and professional life." Lauria, 70 F.4th at 128-29; see also

7

Carpenter v. United States, 585 U.S. 296, 311 (2018) (cell site location data "provides an all-encompassing record of the [cellphone user's] whereabouts . . . revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations'" (quoting United States v. Jones, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring)).

Such concerns apply a fortiori to searches of cellphones, which "as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." Riley, 573 U.S. at 393. iPhones of the sort at issue here typically contain a vast store of private, confidential, and intimate information regarding not just the owner's "associations" but the details of his or her "'familial, political, professional, religious, and sexual associations.'" Carpenter, 585 U.S. 311 (quoting Jones, 565 U.S. at 415 (Sotomayor, J., concurring)). Indeed, today's cellphones are "minicomputers" with "immense storage capacity" that may contain "millions of pages" of material, such as "every picture [a person has] taken, or every book or article [a person has] read," which can allow the "sum of an individual's private life [to] be reconstructed." Riley, 573 U.S. at 393-94; see also United States v. Smith, 967 F.3d 198, 208 (2d Cir. 2020) (noting "the immense storage capacity of modern cell phones and how people commonly use them to store vast amounts of highly personal information"); United States v. Ganias, 824 F.3d 199, 218 (2d Cir. 2016) ("[Q]uantitative measures fail to capture the significance of the data kept by many individuals on their computers. Tax records, diaries, personal photographs, electronic books, electronic media, medical data, records of internet searches, banking and shopping information – all may be kept in the same device, interspersed among the evidentiary material that justifies the seizure or search"); United States v. Galpin, 720 F.3d 436, 446 (2d Cir. 2013) ("[A]dvances in technology and the centrality of computers in the

8

lives of average people have rendered the computer hard drive akin to a residence in terms of the scope and quantity of private information it may contain."). In sum, "smart phones" have become the electronic repository for the type of information that years ago would have been stored under lock and key in one's private desk at home.

B.     **Analysis**

As discussed above, the issue before the Court is whether the Boyer Affidavit alleges facts sufficient to demonstrate "'a fair probability that . . . evidence of a crime [will] be found [in the contents of Silva's phone].'" Lauria, 70 F.4th at 128 (quoting Gates, 462 U.S. at 238).

The Government contends that the probable cause standard is met based on Det. Boyer's allegations regarding (1) Silva's membership and participation in the Dub City gang; (2) his involvement in gang-related shootings in which he acted in concert with other Dub City gang members; (3) his participation in financial crimes; and (4) his status as a fugitive between December 2021 and March 2022. (23 Cr. 204, Govt. Opp. (Dkt. No. 140) at 11-15) The Government further notes that Det. Boyer's specific allegations regarding Silva's gang-related conduct are buttressed by his generalized allegations based on his training and experience, in which Det. Boyer states that those who engage in gang-related criminal conduct frequently use cellphones to coordinate their criminal activities and to store images, videos, and other data related to their criminal activities. (Id.)

The Court agrees that the Boyer Affidavit's allegations demonstrate that there is probable cause to believe that (1) Silva is a longtime member of the Dub City gang; and (2) that he participated in three gang-related shootings in August 2019, October 2021, and November 2021.

What is missing from the Boyer Affidavit, however, are allegations demonstrating that Silva used the seized cellphone in connection with his criminal activities. There are, for example, no factual allegations showing that Silva has used his phone to transmit calls or text messages to gang members, other co-conspirators, or the alleged victims of his crimes. There are no factual allegations that Silva has used his phone to post gang-related material on social media. There are no witness accounts demonstrating that Silva has used his phone in connection with his criminal activities. There is no reference to surveillance camera footage showing Silva using his cellphone at or about the time of the shootings or other criminal activity. There is no evidence that the cellphone was observed at or recovered from the scene of any of the charged offenses.

The Government instead asks this Court to "infer" from "common sense[] and experience" that because of "the precise nature of the violent acts discussed in the Boyer Affidavit (i.e., Silva's involvement in intra-gang feuds with multiple members of Dub City)," it is reasonable to assume that Silva's alleged crimes "would have involved electronic communications of one kind or another." (23 Cr. 204, Govt. Opp. (Dkt. No. 140) at 12) For this same reason, "evidence of Silva's membership in Dub City . . . is likely to be found on his phone (e.g., photos of him with other members of Dub City or social media activity where Silva promoted Dub City)." (Id.)

"A showing of nexus does not require direct evidence and 'may[, of course,] be based on reasonable inference from the facts presented based on common sense and experience.'" United States v. Singh, 390 F.3d 168, 182 (2d Cir. 2004) (quoting United States v. Buck, No. 84 CR. 220 (CSH), 1986 WL 12533, at *4 (S.D.N.Y. Oct. 24, 1986), rev'd on other grounds, 813 F.2d 588 (2d Cir. 1987)). And the Court acknowledges that Silva is accused of long-time membership in a violent street gang, during which he allegedly committed numerous

10

crimes in concert with other gang members. This alleged pattern of racketeering activity makes it likely that Silva would have communicated on countless occasions with other alleged members of the Dub City gang.

But allegations demonstrating that it is likely that Silva communicated frequently with other alleged members of Dub City do not demonstrate that he used his cellphone to communicate with gang members. And evidence that a defendant has engaged in gang-related activity is not sufficient, standing alone, to demonstrate a "'fair probability that contraband or evidence of a crime will be found'" on that defendant's cellphone. Lauria, 70 F.4th at 128 (quoting Gates, 462 U.S. at 238).

The Government's contention that Silva communicated with fellow gang members over the seized cellphone – and that evidence of those communications will likely be found on that cellphone – rests on no more than a "hunch." Id. at 128. That hunch is premised on the notion that because cellphones have become ubiquitous and indispensable in daily life, anyone engaged in conspiratorial criminal activity would likely use his cellphone in connection with or to facilitate that criminal activity. Relying on that logic would, however, entirely vitiate the requirement that "a search warrant must . . . aver some fact that connects [the location or material to be searched] to [a suspect's] alleged participation in criminal activity." United States v. Guzman, No. 97-CR-786 (SAS), 1998 WL 61850, at *4 (S.D.N.Y. Feb. 13, 1998); see also Commonwealth v. Morin, 478 Mass. 415, 426 (2017) ("[P]olice may not rely on the general ubiquitous presence of cellular telephones in daily life, or an inference that friends or associates most often communicate by cellular telephone, as a substitute for particularized information that a specific device contains evidence of a crime."). And the adoption of such reasoning would "'license virtually automatic searches' of the cell phones of any persons suspected of engaging in

criminal conspiracies." United States v. Garcia, No. 3:20-CR-00058 (KAD), 2023 WL 4850553, at *8 (D. Conn. July 28, 2023) (quoting United States v. Gomez, 652 F. Supp. 461, 463 (E.D.N.Y. 1987)).

The Boyer Affidavit's allegations that "[i]ndividuals engaged in gang-related violence and other organized criminal activity need to arrange and coordinate their illicit activities and often use cellular telephones to do so," and that such individuals often have "photographs and video of themselves, their criminal associates, their property, and the tools and proceeds of their criminal activities (such as firearms and cash proceeds) stored [on] their cellular telephones" (23 Cr. 204, Apr. 6, 2022 Search Warrant, Ex. B (Dkt. No. 110-1) at 16-17), do not demonstrate that there is probable cause to believe that Silva's phone contains evidence of a crime. While these allegations are premised on Detective Boyer's experience in gang-related investigations, at bottom they are merely "blanket generalization[s] about how 'people who commit crimes' act," which are "not sufficient" to establish probable cause. Garcia, 2023 WL 4850553, at *7.

"What is missing here is some 'case-specific evidence' that 'nudge[s] [Det. Boyer's] training and experience across the line from sheer speculation to probable cause.'" United States v. Bertini, No. 23 CR. 61 (PGG), 2023 WL 8258334, at *9 (S.D.N.Y. Nov. 29, 2023) (quoting Garcia, 2023 WL 4850553, at *7); see also Guzman, 1998 WL 61850, at *4 (S.D.N.Y. Feb. 13, 1998) ("Permitting a search warrant based solely on the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect." (citations and quotation marks omitted)). Indeed, "the notion that an agent could establish probable cause to search an entire phone based on the truism

12

that criminals' phones often bear traces of their criminality is redolent of the 'general warrants' reviled by the Founding generation." United States v. Skyfield, No. 23-CR-569 (LJL), 2023 WL 8879291, at *15 (S.D.N.Y. Dec. 22, 2023) (quoting Carpenter, 585 U.S. at 303)

Likewise unpersuasive is the Government's argument that because Silva "engages in a variety of financial scams to make money for the gang[,] including using credit cards linked to fake identities," his phone is likely to contain evidence of a crime. (23 Cr. 204, Apr. 6, 2022 Search Warrant, Ex. B (Dkt. No. 110-1) at 15) In this regard, the Government contends that

> [t]he very nature of those crimes implicates the use of electronic devices like cellphones, including as a means to commit those offenses (e.g., by applying for or using a credit card online) or to store, transmit, and keep track of proceeds generated by those offenses (e.g., by making electronic payments, receiving electronic statements, or maintaining an electronic ledger).

(23 Cr. 204, Govt. Opp. (Dkt. No. 140) at 11) But the Boyer Affidavit contains only one conclusory sentence regarding Silva's alleged "financial scams" – which is quoted above – and that one-sentence allegation does not provide a basis for this Court to make a probable cause finding that he engaged in fraud, much less that he used his phone to engage in fraud.

Finally, the Government argues that Silva was a fugitive from December 2021 to March 2022, and that Silva's failure to appear "is evidence of his consciousness of guilt over his role in the August 2019 shooting and other Dub City-related criminal conduct." (Id. at 13) According to the Government, "any evidence of [Silva's] flight is evidence that tends to prove his involvement in the underlying gang-related shooting and other gang-related criminal conduct." (Id.) In this regard, the Government notes that "Silva had [the phone] on him when he was apprehended" (id.), and cites the Boyer Affidavit's assertion that "fugitives frequently use cellular devices to coordinate their flight and evade law enforcement. This includes, among other things, arranging for others to provide them housing, transportation, and money." (23 Cr. 204, Apr. 6, 2022 Search Warrant, Ex. B (Dkt. No. 110-1) at 17) The Government also contends

13

that "Silva's possession of a driver's license and a debit card in a false identity" at the time of his arrest is evidence "that Silva used his cellphone to create, obtain, or pay for those false documents to facilitate his flight." (23 Cr. 204, Govt. Opp. (Dkt. No. 140) at 13)

As discussed above, Silva was arrested on March 23, 2022, after failing to appear for a December 1, 2021 court date in Bronx Criminal Court related to an August 13, 2019 shooting. While courts have found probable cause to search a phone where the phone was recovered "at the scene of the crime," that logic does not apply here, given that Silva's arrest and the seizure of his phone took place two and a half years after the underlying crime was committed. United States v. Robinson, No. 16-CR-545 (S-3)(ADS), 2018 WL 5928120, at *16 (E.D.N.Y. Nov. 13, 2018); see also United States v. Barret, 824 F. Supp. 2d 419, 449 (E.D.N.Y. 2011) (finding probable cause to search a phone seized at the time of the defendant's arrest while he was "attempt[ing] to flee from a house to which large quantities of marijuana had just been delivered").

Moreover, the Boyer Affidavit cites no evidence suggesting that Silva used his phone in connection with or to facilitate his flight. Indeed, the Government's assertion that Silva's phone might contain "evidence of [Silva's] consciousness of guilt over his role in the August 2019 shooting and other Dub City-related criminal conduct" (23 Cr. 204, Govt. Opp. (Dkt. No. 140) at 13) is mere speculation. The Government's contention that Silva likely "used his cellphone to create, obtain, or pay" for the false identification documents found in his possession at the time of his arrest is equally speculative. (Id.) In sum, the Government's contention that (1) Silva might have used his phone to facilitate his flight; and (2) the phone therefore might contain evidence of Silva's consciousness of guilt related to the crimes described

14

in the Boyer Affidavit, is far too attenuated to support a finding of probable cause to search the phone.

The cases cited by the Government (see id. at 15-16) are not to the contrary, and merely confirm that blanket generalizations about the widespread use of cellphones are not sufficient to demonstrate probable cause.

In United States v. Rutledge, No. 23-CR-269 (FB), 2024 WL 1834801 (E.D.N.Y. Apr. 26, 2024), for example, the court relied on evidence that the defendant's cellphone was "active both before and after the armed robbery"; that the defendant "had a flurry of calls – eleven in total – with [an alleged co-conspirator] within a short period of time, several hours prior to the robbery"; and that "[the defendant] and [his alleged co-conspirator] had no other phone communications outside this brief window." Id. at *3.

In United States v. Skyfield, 2023 WL 8879291, the court relied on evidence that "the photograph on the iPhone's home screen – which showed [the defendant] wearing the same graphic t-shirt he allegedly wore both during the shooting and at the Club – is not only evidence of [the defendant's] participation in the charged crime, but also suggests that the iPhone would likely contain other images of [the defendant] in that clothing." Id. *15.

And in United States v. Akparanta, No. 19 CR. 363 (LGS), 2019 WL 5616875 (S.D.N.Y. Oct. 30, 2019), the search warrant affiant alleged that (1) the defendant had been observed using his cellphone in the location where criminal activity occurred; and (2) the defendant had collected phone numbers and social media details from his victims. Id. at *4.

In sum, the Boyer Affidavit contains no factual allegations suggesting that Silva ever used his phone in connection with the crimes described in the Boyer Affidavit. The Government has therefore failed to establish the required nexus between the object to be

15

searched – Silva's phone – and the alleged crimes. Accordingly, the magistrate judge erred in concluding that the Boyer Affidavit's factual allegations provide probable cause to believe that a search of Silva's cellphone will yield evidence of the alleged crimes.

## II.    THE GOOD FAITH EXCEPTION

Silva contends that the Boyer Affidavit is "so lacking in indicia of probable cause that [Detective Boyer] could not reasonably have relied on it" under the good faith exception to the exclusionary rule. (23 Cr. 204, Def. Br. (Dkt. No. 110) at 11)  The Government contends that Detective Boyer "relied on the [w]arrant in good faith." (23 Cr. 204, Govt. Opp. (Dkt. No. 140) at 18)

### A.    Applicable Law

"[E]vidence seized in reasonable, good-faith reliance on a search warrant" need not be suppressed, even if the warrant "is subsequently held" to be unsupported by probable cause. Leon, 468 U.S. at 904-05 (citation omitted).  In so holding, the Leon court reasoned that,

> even assuming that the [exclusionary] rule effectively deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.

Id. at 918-19.  "'The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance' on an invalidated warrant." Clark, 638 F.3d at 100 (quoting United States v. George, 975 F.2d 72, 77 (2d Cir. 1992)).

Although "most searches conducted pursuant to a warrant [are] likely [to] fall within [the] protection [of the good faith exception]" (id.), the exception does not apply

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

Id. (quoting United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992)).

Search warrant affidavits "so lacking in indicia of probable cause" are commonly known as "bare bones" affidavits. United States v. Jones, 43 F.4th 94, 111-12 (2d Cir. 2022). A "bare bones" search warrant affidavit is "'totally devoid of factual circumstances to support [its] conclusory allegations.'" Id. (quoting Clark, 638 F.3d at 103); see also Gates, 462 U.S. at 239 (noting that an issuing magistrate's "action cannot be a mere ratification of the bare conclusions of others"); Burns v. United States, 235 A.3d 758, 772 (D.C. 2020) ("[B]are bones affidavits" are "unadorned . . . claim[s] of probable cause based on an affiant's training and experience," which "fail[ ] to provide the judge considering a warrant application a sufficient factual basis to assess compliance with the Fourth Amendment." (citations and quotation marks omitted)).

In considering whether the good faith exception to the exclusionary rule applies, courts apply an objective test:  whether the agents who "executed a warrant" and who "provided information material to the probable-cause determination" could have "harbored an objectively reasonable belief in the existence of probable cause." Leon, 468 U.S. at 923 n.24, 926; George, 975 F.2d at 77 ("Reasonable reliance does not allow an officer to conduct a search with complete disregard of the warrant's validity because the standard of reasonableness is an objective one.") (internal quotation marks and alterations omitted). Under Leon's objective standard, evidence may be subject to suppression even where there is no reason "to suspect any ill motive or subjective bad faith . . . of the officers who prepared and executed the [invalid] warrant." United States v. Griffith, 867 F.3d 1265, 1279 (D.C. Cir. 2017); United States v. Wey, 256 F. Supp. 3d 355, 408 (S.D.N.Y. 2017) ("The Court does not conclude that the agents acted with malice. But it does find that their conduct cannot be credibly explained by exigent circumstance, by simple mistake, or by mere negligence.").

17

Applying these standards, courts have suppressed evidence obtained through search warrants that were premised on "bare bones" affidavits – affidavits that did not allege facts sufficient to draw a plausible nexus between a suspect's alleged criminal conduct and the electronic device, material, or location to be searched.  For example, in United States v. Garcia, 20-CR-58 (KAD), 2023 WL 4850553, at *1 (D. Conn. July 28, 2023), officers obtained a search warrant for a suspect's cellphone.  The search warrant affidavit stated that "people who commit crimes often communicate with their co-conspirators, before, during and after the commission of such crimes," and that "[t]he most common method of communications is through cellular phones."  Id. at *7.  The court found that the detectives' assertion did not provide "sufficient indicia of probable cause" to support a search of the cellphone, even though there was ample evidence that the defendant was part of a conspiracy to commit murder and destroy evidence.  Id. at *8, *12.  The Garcia court went on to suppress the evidence obtained from the defendant's cellphone, finding that the "warrant was not supported by probable cause, was not sufficiently particularized, and was extraordinarily overbroad," and that therefore "the detectives had no objectively reasonable basis for relying upon it."  Id. at *13.

And in United States v. Bertini, No. 23 CR. 61 (PGG), 2023 WL 8258334, at *1 (S.D.N.Y. Nov. 29, 2023), the officers executed a search warrant for cell site location data for a phone belonging to the defendant.  The search warrant affidavit was "devoid of factual allegations suggesting that [the defendant] had carried or used his cell phone in connection with or to facilitate" the bank burglaries he was charged with committing.  Id. at *12.  Instead, the search warrant affidavit relied on

> the agent's naked assertions that (1) "individuals often use cellphones for
> unrelated reasons prior to and/or following the commission of criminal activity,"
> and (2) "individuals engaged in [bank burglaries] often have cellphones on their

person prior to, during, and/or after the commission of such offenses" (Harper Aff. (Dkt. No. 29-1) ¶ 20)

Id. In asserting that the defendant had likely carried a cellphone during the bank burglary, the search warrant affidavit also erroneously cited to (1) "the existence of a conspiracy," when the defendant allegedly acted alone; and (2) "the need to use a cell phone to locate a targeted location," where "the [d]efendant . . . lived in a building located next to one of the targeted banks[] and . . . had previously burglarized the same bank." Id. at *12. This Court concluded that "the affidavit contained 'glaring deficienc[ies] that any reasonable police officer would have known was constitutionally fatal.'" Id. (quoting Groh v. Ramirez, 540 U.S. 551, 564 (2004)).

### B.    Analysis

Silva does not argue that "'the issuing magistrate has been knowingly misled'"; that "'the issuing magistrate wholly abandoned his or her judicial role'"; or that "'the warrant is so facially deficient that reliance upon it is unreasonable.'" Clark, 638 F.3d at 100 (quoting Moore, 968 F.2d at 222). Silva instead contends that the Boyer Affidavit is "so lacking in indicia of probable cause" that reliance on it was unreasonable. (23 Cr. 204, Def. Br. (Dkt. No. 110) at 11)

The Government responds that the Boyer Affidavit alleges "ample case-specific evidence that supported the conclusion that Silva used his cellphone in furtherance of his criminal activity," and that "[t]hose case-specific facts were then buttressed by Detective Boyer's specific observations about how certain gang-related crimes are committed, which were based on his own expertise in gang-related crime." (23 Cr. 204, Govt. Opp. (Dkt. No. 140) at 20)

As discussed above, however, the Boyer Affidavit is entirely devoid of factual allegations suggesting that Silva had used the seized cellphone in connection with the crimes alleged in the affidavit and criminal complaint. The Government instead asks this Court to

19

"infer" from "the precise nature of the violent acts discussed in the Boyer Affidavit (i.e., Silva's involvement in intra-gang feuds with multiple members of Dub City)" that those crimes "likely would have involved electronic communications of one kind or another" and that "evidence of Silva's membership in Dub City . . . is likely to be found on his phone." (Id. at 12) For the reasons discussed above, however, the Government's assertion that those who engage in gang-related criminal activity often use a cellphone to facilitate or record their criminal activities is not sufficient – standing alone – to justify a search of an alleged gang-member's phone. The Government must instead proffer facts showing that the phone was used to facilitate the alleged criminal activity.

Nor can the Government rely on the Boyer Affidavit's naked assertions that (1) "[i]ndividuals engaged in gang-related violence and other organized criminal activity need to arrange and coordinate their illicit activities and often use cellular telephones to do so"; (2) "[i]ndividuals engaged in gang-related violence and other organized criminal activity of have photographs and video of themselves, their criminal associates, their property, and the tools and proceeds of their criminal activities (such as firearms and cash proceeds) stored their cellular telephones"; and (3) "fugitives frequently use cellular devices to coordinate their flight and evade law enforcement." (23 Cr. 204, Apr. 6, 2022 Search Warrant, Ex. B (Dkt. No. 110-1) at 16-17) These generalizations about how criminal suspects use cellphones are entirely conclusory and facially insufficient; they do not plug the gap created by the failure to allege facts showing that the phone was actually used to facilitate the alleged criminal activity. Gates, 462 U.S. at 239 ("An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, and [a] wholly conclusory statement . . . fail[s] to meet this requirement.").

Moreover, as this Court found in Bertini, "[r]eliance on the search warrant affidavit here . . . cannot be attributed to a lack of clarity in the law." Bertini, 2023 WL 8258334, at *12.  The Government cites no case suggesting that probable cause to search a cellphone may be established solely on the basis of (1) evidence that the suspect has engaged in gang or group-related criminal activity; and (2) generalized observations that suspects engaged in conspiratorial criminal activity often use cellphones to facilitate their crimes.  Detective Boyer is "charged with reasonable knowledge of what the law prohibits," Wey, 256 F. Supp. 3d at 408, and "should have known that a search warrant affidavit must include particularized, non-conclusory factual allegations demonstrating a nexus between a suspect's alleged criminal conduct and the materials to be searched." Bertini, 2023 WL 8258334, at *12.

Nor may the Government rely on the mere fact that the magistrate judge approved the search warrant.  "Notwithstanding the deference that magistrates deserve," reviewing courts "[can]not defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining . . . probable cause." Leon, 468 U.S. at 915 (citations and quotations marks omitted); see also Wey, 256 F. Supp. 3d at 398 ("[T]he mere presence of a warrant does not end the inquiry into objective reasonableness." (citations and quotation marks omitted) (internal citations omitted).  "[I]f the officer's good faith could be established by the mere fact that the judge approved the warrant application," then the good faith exception would "swallow the rule" that affidavits must provide a substantial basis for determining probable cause. United States v. Turner, 713 F. Supp. 714, 723 (D. Vt. 1989) (citing Leon, 468 U.S. at 923).

Finally, the issue of probable cause here is not one "upon which reasonable minds can differ." United States v. Falso, 544 F.3d 110, 128 (2d Cir. 2008); see also Leon, 468 U.S. at

21

926 (applying good faith exception where the affidavit "provided evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause"). The Boyer Affidavit contains no factual allegations demonstrating or suggesting that Silva had used the phone at issue to commit, facilitate, or coordinate the crimes alleged in the affidavit and criminal complaint.   The Government's assertion of probable cause depended entirely on the notion that participants in gang or group-related criminal activity would probably use a cellphone in furtherance of their activities.  While that suspicion or "hunch" is not unreasonable in today's world, it is well established that such "hunches" do not provide a basis for finding probable cause under the Fourth Amendment.  The search warrant affidavit thus reflected "glaring deficienc[ies] that any reasonable police officer would have known was constitutionally fatal." Ramirez, 540 U.S. at 564.

## CONCLUSION

For the reasons stated above, Defendant Silva's motion to suppress evidence obtained from the blue iPhone seized from him at the time of his arrest is granted.

The Clerk of Court is directed to terminate the motion (Dkt. No. 109).

Dated: New York, New York
       July 19, 2024

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge